**FILED**

**FEBRUARY 5, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| Jerry Miller, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) No. | |
| City of Chicago Police detectives Gerald | ) | **08 C 773** |
| Mahon, #15640, Thomas Stevens, #14489, | ) Judge | |
| Thomas Whalen, # 15670, P. Mannion, # 8303, | ) | |
| officers Kenneth Fligelman, # 6542, Darryl | ) Magistrate | **JUDGE CONLON** |
| Depke, # 14080, Chicago Police Department | ) | **MAGISTRATE JUDGE COLE** |
| Crime Laboratory microanalyst Raymond Lenz, | ) | |
| Thomas E. Krupowicz, John and Jane Doe, | ) | |
| Peter and Paula Poe and the City of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

Jerry Miller, by his counsel Cochran Neufeld & Scheck, LLP and People's Law Office,

hereby alleges as follows:

1.  Plaintiff Jerry Miller spent the majority of his adult life in prison, for a crime he did

not commit.

2.  On April 23, 2007, Jerry Miller was exonerated, and all charges against him were

dismissed, more than twenty six years after he was arrested for, and then convicted of, the rape,

aggravated kidnaping and robbery of the victim R.S.  Attachment A.

3.  The exoneration was based on DNA testing which conclusively established that Jerry

Miller did not commit the crime against R.S.

4.  This DNA testing further established that the actual perpetrator of the crimes for

which plaintiff was convicted was Robert Weeks.

5.  Jerry Miller's arrest, detention, prosecution, conviction, and imprisonment were the product of unconstitutional and unlawful efforts by defendant police officers and City of Chicago employees, acting individually and in concert, pursuant to municipal policies and customs, to use any means necessary to gain a conviction.

6.  Acting individually and in concert, the defendants intentionally employed numerous irreparably suggestive identification procedures; withheld from the prosecutor and defense material exculpatory evidence including evidence of the unduly suggestive witness and victim identification procedures and physical evidence which was recovered from the scene of the crime and R.S.; fabricated evidence including forensic testing and evidence relating to Mr. Miller's stop, arrest and alibi; falsely claimed that plaintiff had made statements which undermined his alibi; and failed to investigate and disregarded evidence pointing to other potential suspects in these offenses.

7.  As a direct result of defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Jerry Miller sustained injuries and damages, including loss of his freedom for more than twenty five years, personal injuries, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel,

enjoyment, and freedom of speech and expression.

8. Beyond compensating Mr. Miller for these continuing injuries and the more than twenty five years during which he was imprisoned, convicted and/or under legal disability as a result of this conviction, this action seeks to redress the unlawful municipal policies and practices pursuant to which defendants, acting under color of law both independently and in concert, violated his clearly established rights as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the laws of the State of Illinois.

9. The City of Chicago maintained a custom and practice of failing to disclose exculpatory evidence to prosecutors, misrepresenting forensic testing and evidence and failing to pursue available forensic testing which would potentially provide exculpatory evidence to criminal defendants. These official practices began long before 1981 and continued thereafter and were the moving force behind the repeated individual misconduct perpetrated against Mr. Miller in this case.

**JURISDICTION**

10. This court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the claims arising out of violations of the United States Constitution.

11. Supplemental jurisdiction over Mr. Miller's state law claims exists pursuant to 28 U.S.C. § 1367(a).

**VENUE**

12. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Northern District of Illinois Eastern Division, the judicial district in which the claims arose and in which all defendants reside

or conduct business.

**PARTIES**

13. Plaintiff Jerry Miller is, and at all times material to this Complaint was, a resident of the State of Illinois. He currently resides in Riverdale, Illinois.

14. Defendant City of Chicago ("Chicago") is a municipality that is a political subdivision of the State of Illinois, was the employer of the individual defendants, and is responsible for the policies, practices and customs of the Chicago Police Department.

15. Defendants Gerald Mahon, Thomas Stevens, Thomas Whalen, P. Mannion, Kenneth Fligelman, and Darryl Depke, were at the time of the occurrences complained of Chicago police officers who were acting in the course and scope of their employment and under color of state law. Each is sued in his individual capacity.

16. Defendant Raymond Lenz was at the time of the occurrence complained of a microanalyst employed by the Chicago Police Department in the police department crime laboratory who was acting in the course and scope of his employment and under color of state law. He is sued in his individual capacity.

17. Defendant Thomas E. Krupowicz was at the time of this occurrence a fingerprint examiner with the Chicago Police Department crime laboratory who was acting in the course and scope of his employment and under color of state law. He is sued in his individual capacity.

18. Defendants John and Jane Doe are employees of the City of Chicago and its police department and/or crime lab who knew that physical evidence, including fingerprints and serological evidence, excluded plaintiff as being the attacker of R.S. but concealed this evidence

4

from prosecutors and defense counsel and from the jury at plaintiff's criminal trial. These

defendants were, at all times relevant to this action, acting under color of law and within the

scope of their employment for the City of Chicago. Each is sued in her or his individual

capacity.

19. Defendants Peter and Paula Poe are employees of the City of Chicago and its police

department and/or crime lab who were, at all times relevant to this action, supervisors of the

named individual defendants and employees of the Chicago Police Department. These

defendants were, at all times relevant to this action, acting under color of law and within the

scope of their employment for the City of Chicago. Each is sued in her or his individual

capacity.

**FACTS**

20. On September 16, 1981 between 9:30 - 10:30 p.m. R.S. was raped, robbed, beaten

and abducted in a parking lot located at 506 N. Rush Street, Chicago, Illinois.

21. The person who attacked R.S. was Robert Weeks.

22. In the course of the rape Weeks ejaculated and his semen was deposited on the

clothing of R.S.

23. After brutally attacking and raping R.S., Weeks, who was not wearing gloves, opened

the trunk of the car, pushed R.S. into the trunk, and closed the lid of the trunk.

24. Weeks then attempted to drive out of the parking lot in the car, but the cashier, Elaine

Boston, recognized that the car belonged to R.S. and refused to allow him to exit.

25. Another parking lot employee, Milton Stewart, spoke to Weeks while he was in the

car.

26. Weeks then got out of the car and fled the parking lot on foot.

27. R.S. was rescued from the trunk of the car and taken to Northwestern Memorial Hospital where she was diagnosed as suffering several serious injuries as a result of the attack.

28. At the hospital medical personnel took custody of the clothing that R.S. was wearing at the time of the attack, and gave the clothing to the police.

29. Investigating detectives defendants Mahon and Stevens questioned Boston and Stewart and obtained a description of the attacker as a black male 20-25 years of age, about 140-160 lbs., with "sparse facial hair," and wearing a hair net.

30. Evidence technician Kelly examined the car of R.S. and recovered latent finger and palm prints from the trunk and other parts of the vehicle.

31. On September 17, 1981, defendants Mahon and Stevens visited R.S. at the hospital and interviewed her.

32. R.S. described the circumstances of the attack in great detail. R.S. did not view any photographs at this time, but police noted that she would view photographs as soon as her health permitted.

33. On September 17, 1981, Boston and Stewart viewed photos of known offenders, and failed to select any suspects.

34. On September 18, 1981, a composite picture of the attacker was prepared by a police artist, working with witnesses Boston and Stewart.

35. On September 19, 1981, defendants Fligelman and Depke saw the composite picture,

6

and subsequently claimed that the sketch resembled Jerry Miller, whom they had unlawfully detained on the street at 500 W. Armitage, Chicago several days earlier, on September 11, 1981.

36. Mr. Miller had not engaged in any activity that justified any police intervention on September 11, and was in that location because he was looking for a job.

37. Mr. Miller had been honorably discharged from the military approximately one year before, and had been consistently employed since that discharge.

38. Mr. Miller had never been convicted of any crime.

39. On September 19, 1981, defendant officers Fligelman and Depke went to Jerry Miller's home and arrested him, without probable cause and without reading plaintiff his rights.

40. Defendant officers Fligelman and Depke then transported plaintiff in handcuffs to the police station at Belmont and Western, where he remained, isolated from his family, for approximately seventy two hours.

41. In their subsequent written reports, Fligelman and Depke fabricated evidence concerning the arrest of Mr. Miller and their prior interaction with him in order to justify their illegal actions and to falsely implicate Mr. Miller.

42. For example, Fligelman and Depke reported that Mr. Miller had voluntarily gone with them to the police station for questioning when in fact Mr. Miller was arrested and taken to the station against his will and in handcuffs. They further misrepresented that Mr. Miller was observed on September 11, 1981, wearing a hairnet which matched the description of the assailant and engaging in suspicious behavior. In fact, Mr. Miller, was not wearing a hairnet when he encountered the police on September 11, 1981 and was not engaging in suspicious

behavior.

43. After arresting plaintiff on September 19 defendants Whalen and Mannion then interrogated plaintiff at the police station.

44. During this interrogation plaintiff denied committing the attack on R.S. and told these defendants that at the time of the attack he had been home with his family, watching the boxing match between Sugar Ray Leonard and Thomas Hearns.

45. Defendants Whalen and Mannion falsely reported, however, that plaintiff said that he did not watch the boxing match.

46. In fact, plaintiff never wavered concerning his whereabouts on the night R.S. was attacked and always correctly reported that at the time of the attack he was at home, watching the televised boxing match.

47. On September 20, 1981, during Mr. Miller's unlawful incarceration at the police station, defendants Whalen, Mannion, Fligelman and Depke organized and then conducted a line-up that was viewed by witnesses Boston and Stewart.

48. Mr. Miller looked nothing like the actual assailant, Weeks, who was seen by both Stewart and Boston. Notwithstanding the fact that Miller looked nothing like the actual perpetrator, Boston and Stewart identified Miller as the attacker.

49. These misidentifications were the result of intentional suggestions by defendant officers Whalen, Mannion, Fligelman and Depke who indicated to witnesses Boston and Stewart that they should select Miller as the assailant.

50. Defendants Whalen, Mannion, Fligelman and Depke compounded the unduly

suggestive nature of these line-ups by coercing witness Stewart to change his initially "tentative" identification to a positive identification.

51. At some point after Jerry Miller was arrested and brought to the police station on September 19, but before R.S. was discharged from the hospital on September 22, investigators Mahon, Stevens and/or Whalen again visited R.S. and showed her a group of photos in which the only photo of a suspect was that of Jerry Miller while the other half dozen or so photos were fillers.

52. In this identification procedure, R.S. picked out two of the fillers as "possible."

53. R.S. did not select the photograph of Jerry Miller as the offender.

54. Defendants Mahon, Stevens and/or Whalen failed to maintain or disclose the photo arrays, the photographs that R.S. actually selected or the photos that were shown.

55. In addition, defendants Mahon, Stevens and/or Whalen failed to record in a permanent police report the failure of R.S. to select Jerry Miller or the selection of two non-suspects as "possible."

56. The photographs which R.S. selected as "possible," as well as the entire photo array and the circumstances of the identification procedure, constituted exculpatory evidence which was never produced to the prosecutor or to Mr. Miller.

57. Notwithstanding the fact that R.S. failed to select a photo of Mr. Miller from the photo array, and selected photos of two other individuals as "possible" assailants after viewing photo arrays, R.S. later testified at trial that she believed she could identify her assailant and that Mr. Miller "looked like" her assailant.

58. R.S.'s testimony that Mr. Miller looked like the assailant was the result of defendants' improper suggestions to her.

59. C.P.D. supervisors Peter and Paula Poe directly supervised the defendant officers and detectives and/or directly participated in the investigation, and knew or should have known of the unconstitutional conduct of their subordinates, yet failed to adequately supervise them and correct their misconduct.

60. As part of their investigation, the police defendants also attempted to link physical evidence taken from the crime scene and victim to the assailant.

61. For example, as described above, evidence technician Kelly examined the car of R.S. and recovered latent finger and palm prints from trunk and other parts of the vehicle. This evidence was particularly important because the assailant, who was not wearing gloves, opened and closed the victim's trunk and one or more of the car doors with his hands.

62. While at the police station, defendants informed Mr. Miller that palm prints had been taken from the vehicle which could be matched to the assailant, and took finger and palm prints from Mr. Miller so that they could be compared to the prints taken from the car.

63. Although the palm prints taken from the car did not match Mr. Miller's, defendant Krupowicz and other defendants misrepresented in police reports and in pretrial conversations with prosecutors that the prints taken from the trunk of the vehicle were of insufficient quality for comparison.

64. The Chicago Police Department Crime Laboratory and its employees, including defendant Krupowicz, intentionally failed to report exculpatory evidence in this case, including

that the palm and finger prints found on the car did not match plaintiff.

65. The Chicago Police Department Crime Laboratory also examined the clothing worn by R.S. at the time of the rape and determined that there were spermatozoa on the slip which had been worn by R.S.

66. In the hopes of linking the spermatozoa through serological testing to Mr. Miller, the prosecution moved for and successfully obtained blood samples from Mr. Miller.

67. However, Chicago Police Department Crime Laboratory reports created after defendants sought and obtained blood samples from Mr. Miller, reported that testing of the semen recovered from the victim's slip to determine the A, B, O type yielded "inconclusive findings."

68. In fact, this semen did not come from Jerry Miller but from Robert Weeks.

69. In many cases during this time period employees of the Chicago Police Department Crime Laboratory reported results of A, B, O testing as "inconclusive" when in fact the testing yielded results which were inconsistent with the guilt of the accused defendant. These cases included several of those set forth in paragraph 76 below.

70. In this case, the testing of the semen yielded results which were inconsistent with the guilt of Jerry Miller but these results were not reported as such by defendant Raymond Lenz.

71. The Chicago Police Department Crime Laboratory and its employees, including defendant Lenz, intentionally failed to report exculpatory evidence in this case, including that the results of the A, B, O testing were not inconclusive but were in fact inconsistent with the guilt of Jerry Miller.

72. Crime lab supervisors, acting intentionally and/or with deliberate indifference,

11

actively participated in and/or knew or should have known of the unconstitutional conduct of defendants described above, yet failed to take even minimal steps to prevent or remedy this misconduct.

73.  In their pre trial oral and written communications with prosecutors, defendants concealed and affirmatively misrepresented the suggestive practices utilized during the identification procedures, the forensic misconduct and the fact that Mr. Miller consistently maintained his alibi.  Defendants further misrepresented and concealed these facts from prosecutors and Mr. Miller in their pre-trial hearing and trial testimony.

74.  The constitutional violations perpetrated against plaintiff in this case were not isolated.  Beginning long before 1981 and continuing thereafter the City of Chicago maintained a custom and practice of failing to document and disclose exculpatory evidence and of misrepresenting forensic testing and evidence, and this custom and practice was the moving force behind the numerous constitutional violations in this case.

75.  For instance, in *George Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), a federal jury found, and the Seventh Circuit affirmed, that in 1981 the City of Chicago, through its police department, had in force and effect a department-wide policy of long standing which had been consciously approved at the highest policy-making level, of maintaining "street files" which contained exculpatory evidence which were concealed from prosecutors and criminal defendants.

76.  Additionally, in many other cases prior to, at the time of, and subsequent to the prosecution of Jerry Miller, the Chicago Police Department Crime Laboratory failed to provide to prosecutors and defense counsel scientific evidence which was exculpatory of criminal defendants.  These cases include the cases of Michael Evans, Paul Terry, George Jones, John

12

Willis, Dan Young, Harold Hill, Calvin Ollins, Omar Saunders, Marcellius Bradford, Larry Ollins, Donald Reynolds, Billy Wardell and Lafonso Rollins.

77.  Mr. Miller was tried for the rape, robbery, kidnaping and aggravated battery of R.S. in September and October of 1982 and convicted after a jury trial on October 1, 1982.

78.  As a result of the defendants' failure to disclose exculpatory evidence to plaintiff, their failure to properly investigate other potential suspects and their fabrication of inculpatory evidence, as set forth above, plaintiff was convicted of the attack on R.S. and sentenced to a total of 52 years in prison.

79.  After the conviction an order was entered by the trial judge ordering that all physical evidence introduced at trial was to be impounded and maintained in the secure custody of the Clerk of the Circuit Court, and the evidence was in fact impounded.

80.  After plaintiff was convicted and sentenced the defendants failed to disclose their wrongdoing as set forth above during the pendency of plaintiff's direct appeal, his post conviction proceedings, his habeas corpus petition, the appeal of his habeas corpus petition and the duration of his imprisonment.

81.  As a result of the defendants' failure to reveal their wrongdoing, all of plaintiff's challenges to his conviction and sentence were denied.

82.  Plaintiff was imprisoned until March 20, 2006 when he was paroled.

83.  After his release from prison, plaintiff was required to register as a sex offender, and his status as a sex offender was widely and publicly published via the Internet and otherwise, which led to his photograph, his home address and personal details being broadcast to the public at large and him being identified as a violent rapist.

84.   After his release from prison, plaintiff was on parole and subject to the onerous conditions of parole, with the ever-present threat of being returned to prison.

85.   In July 2006 the Office of the Cook County State's Attorney agreed to a request from plaintiff's attorneys for DNA testing of the physical evidence which had been impounded in the case.

86.   On March 27, 2007, the results of the DNA testing were received by the Office of the Cook County State's Attorney and they established that plaintiff was not the source of the semen found on R.S.'s clothes.

87.   R.S. advised the Office of the Cook County State's Attorney that there was no possibility that the semen came from anyone other than the rapist.

88.   The semen was subsequently identified as belonging to Robert Weeks, a recidivist sex offender, who committed another rape, robbery and assault shortly after he attacked R.S. and who later committed several other sexual assaults and other crimes.

89.   On April 20, 2007, the Office of the Cook County State's Attorney and plaintiff's attorney filed a joint motion to vacate plaintiff's conviction and sentence and to terminate his sex offender status on the grounds of actual innocence.

90.   On April 23, 2007, an order was entered vacating plaintiff's conviction on the grounds of actual innocence.

91.   On April 23, 2007, an order was entered terminating plaintiff's sex offender registration on the grounds of actual innocence.

92.  Each of the individual defendants, acting under color of law, conspired among themselves and with others, reached a mutual understanding and acted in concert to undertake a

14

course of conduct that violated the constitutional rights of Jerry Miller, to wit:

    A.    Defendants engaged in unduly suggestive procedures to fabricate the witnesses' and victim's identifications of Mr. Miller;

    B.    Defendants misrepresented and concealed material facts pertaining to the identifications of Mr. Miller, the circumstances of his prior stop, arrest and his alibi and the availability and results of forensic testing that could and/or did exclude plaintiff, in order to obtain the approval of the state's attorney to file charges against him and to continue the prosecution;

    C.    Defendants suppressed the above described material exculpatory and impeachment information from the prosecutors, through Mr. Miller's trial and conviction and thereafter;

    D.    Defendants fabricated the above described falsely inculpatory evidence all of which was used to convict Mr. Miller at trial; and

    E.    Defendants Mahon, Fligelman, Depke, and Lenz testified falsely at Mr. Miller's criminal trial in order to conceal the defendants' misconduct and secure Mr. Miller's conviction.

## COUNT I
### (42 U.S.C. § 1983 14th Amendment Denial of Fair Trial Claim)

93.  Plaintiff realleges paragraphs 1 through 92 as though fully stated herein.

**Fabrication of Evidence**

94.  Defendants individually, jointly, and in conspiracy, fabricated evidence which caused the conviction of plaintiff, including that he stated that he was not watching a boxing match at

15

the time of the attack on R.S., that Boston and Stewart identified plaintiff as the attacker without intentional suggestiveness in the identification procedure, that the victim reported that Miller looked like the assailant without intentional suggestiveness by the defendants, that plaintiff went to the station voluntarily and that he was lawfully arrested, that plaintiff was wearing a hair net on September 11, 1981 when he was stopped by Depke and Fligelman, that palm and fingerprints from the victim's car were inadequate for comparison and that serology testing yielded "inconclusive findings" when in fact it tended to show Mr. Miller's innocence.

**Failure to Disclose Exculpatory and Impeachment Evidence**

95. Defendants individually, jointly, and in conspiracy, failed to disclose to prosecutors material exculpatory and impeachment evidence, including the multiple acts of intentional suggestion during the identification procedures, that the finger and palm prints recovered were adequate for comparison, that the prints found on the car of R.S. did not match the prints of plaintiff, the circumstances of the arrest, prior stop and interrogation, that they had falsified the claim that plaintiff ever said he did not watch a boxing match on September 16, 1981 at the time of the attack on R.S., that the finger and palm prints recovered were adequate for comparison, that the prints found on the car of R.S. did not match the prints of plaintiff, and that serology testing that was conducted tended to show Mr. Miller's innocence.

96. By failing to disclose this information, defendants violated the Fourteenth Amendment, as interpreted by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, which imposed a clear duty on these investigating officials to report all material exculpatory and impeachment information to prosecutors.

**Unduly Suggestive Identification Procedures**

97.  Defendants, individually, jointly, and in conspiracy, intentionally conducted unduly suggestive identification procedures, including the lineup procedures conducted with Boston and Stewart, and the photo array procedure conducted with R.S. during the time she was hospitalized. Defendants concealed from prosecutors the actual circumstances of those identification procedures, including that defendants had intentionally provided suggestions to the witnesses and the victim in order to procure their identifications of Mr. Miller.

98.  As a result of the defendants' use of unduly suggestive identification procedures, plaintiff was denied a fair trial and was wrongfully convicted.

**Failure to Investigate**

99.  Defendants acting individually and in concert and conspiracy intentionally and/or recklessly failed to properly and adequately investigate this case, including failing to investigate other potential suspects, by, *inter alia*, failing to investigate the obvious discrepancies between the description of the offender given by the witnesses and the actual appearance of Jerry Miller, failing to preserve the photographs shown to R.S., failing to investigate other suspects (including the persons whose photographs R.S. picked out as "possible"), failing to conduct non-suggestive identification procedures, failing to conduct and/or record scientific testing which did and/or would have contradicted and/or called into question the identification of Jerry Miller as the offender, and failing to investigate or accurately record Jerry Miller's statements as to his location at the time of the crime.

100.  As a result of this failure to disclose exculpatory and impeachment evidence, intentional use of unduly suggestive identification procedures, failure to properly investigate and

17

fabrication of evidence, plaintiff was denied a fair trial and was wrongfully convicted.

**COUNT II**
**(42 U.S.C. § 1983 4th and 14th Amendment Claim for Malicious Prosecution)[1]**

101.  Plaintiff realleges paragraphs 1 through 100 as though fully stated herein.

102.  Defendants, despite knowing that probable cause did not exist to arrest and prosecute Mr. Miller for the rape, robbery, battery and kidnapping of R.S. acted individually and in concert to cause Mr. Miller to be arrested and prosecuted for that crime, thereby violating Mr. Miller's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures and to due process.

103.  Specifically, despite the fact that the defendants were aware of information that probable cause did not exist to arrest Mr. Miller, the defendants intentionally caused Mr. Miller to be arrested and prosecuted for the rape, robbery, battery and kidnapping of R.S.  Furthermore, the defendants intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Mr. Miller, as set forth above, and failed to investigate evidence which would have led to the actual assailant.  The defendants performed the above-described acts deliberately, with reckless disregard for the truth, and with malice.

104.  In fact, Mr. Miller, as he stated from the time of his arrest and maintained throughout his wrongful incarceration, was innocent of the rape, robbery, battery and kidnapping

---

[1]Plaintiff recognizes that the Seventh Circuit Court of Appeals has held that there is no cause of action for malicious prosecution under 42 U.S.C. § 1983, under either a fourth or a fourteenth amendment theory.  This issue has not yet been determined by the United States Supreme Court and plaintiff is pleading this count in order to preserve this issue for potential review by the United States Supreme Court and for potential reconsideration by the Seventh Circuit Court of Appeals of its prior holdings.

18

of R.S.  On April 23, 2007, the prosecution terminated in Mr. Miller's favor when his conviction was vacated.

105.  As a direct and proximate result of the defendants' actions Mr. Miller was wrongly convicted and imprisoned and was deprived of his freedom for over twenty five years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT III
### (42 U.S.C. § 1983 *Monell* Claim Against the City of Chicago)

106.  Plaintiff realleges paragraphs 1 through 105 as though fully stated herein.

107.  The City of Chicago created and maintained a *de facto* custom, policy or practice of deliberate indifference to the constitutional rights of citizens, by failing adequately to train and supervise and discipline its police officers and members of the Crime Laboratory, including the individual defendants in this case, to ensure that they:

    A.      employed proper and non-suggestive identification techniques;

    B.      faithfully represented material facts when seeking criminal charges;

    C.      adequately tested physical evidence, including palm prints, finger prints and bodily fluids and fully and accurately reported the results of that testing; and

    D.      disclosed material exculpatory and impeachment information to prosecutors.

108. The City of Chicago also created and maintained a *de facto* custom, policy or practice of failing to document and/or disclose exculpatory evidence and of misrepresenting and/or failing to disclose forensic testing and evidence which was exculpatory of criminal

defendants, as evidenced by the multiple violations in this case and other cases both before and after.

109. The customs and practices set forth above were the moving force behind the numerous constitutional violations in this case.

110. The City of Chicago's failure to train, discipline and supervise its police officers adequately in their constitutional duties, and its creation and maintenance of a custom, policy or practice of failing to disclose exculpatory evidence, directly and proximately caused Jerry Miller to suffer constitutional deprivations, including his false arrest, unfair trial, wrongful conviction, and the other grievous and permanent injuries and damages set forth above.

---

**COUNT IV**
**(42 U.S.C. § 1983 Supervisory Liability Claim)**

111. Plaintiff realleges paragraphs 1 through 110 as though fully stated herein.

112. The unfair trial, and wrongful conviction of Jerry Miller were caused by the deliberate indifference and recklessness of defendants Peter and Paula Poe when they failed adequately to train and supervise the individual defendants in this case.

113. Specifically, these yet to be identified supervisory defendants were personally involved in the case against Jerry Miller and knew or in the absence of their deliberate indifference and recklessness should have known of their subordinates' unconstitutional actions and related misconduct in the case.

114. Furthermore, these yet to be identified supervisory defendants failed to train and supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned identification procedures and production of exculpatory

evidence, thereby encouraging and/or permitting these employees and other defendants to use

unreliable and discredited identification techniques, to fabricate false inculpatory evidence, and

to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations

suffered by Jerry Miller.

115. These identification techniques, failures in producing exculpatory evidence,

fabrications, and other investigative procedures were contrary to accepted methods used by law

enforcement agencies. The fact that the defendant supervisors failed to train and supervise their

subordinates to ensure that they employed proper identification and investigation procedures

demonstrates deliberate indifference and reckless disregard for Jerry Miller's constitutional

rights.

116. The personal involvement of the defendant supervisors, through their actions and

omissions, proximately and directly caused the constitutional deprivations and grievous personal

injuries suffered by Jerry Miller, including the above-mentioned injuries and damages.

## COUNT V
### (Malicious Prosecution Claim under Illinois law)

117. Plaintiff realleges paragraphs 1 through 116 as though fully stated herein.

118. The criminal proceedings against plaintiff were terminated in his favor on April 23,

2007.

119. Defendants individually, jointly, and in conspiracy, by fabricating and altering the

evidence against plaintiff, by intentionally conducting unduly suggestive identification

procedures, by concealing material exculpatory and impeachment evidence from the prosecutors,

by failing to properly and adequately investigate the case against Jerry Miller and other possible

suspects, and by deceiving the prosecutors who prosecuted plaintiff's case, initiated and

continued a malicious prosecution without probable cause against plaintiff.

## COUNT VI
### (Intentional Infliction of Emotional Distress Claim under Illinois law)

120. Plaintiff realleges paragraphs 1 through 119 as though fully stated herein.

121. The extreme and outrageous conduct of the individual defendants as set forth above,

which was intentional or reckless, caused, and continues to cause, severe emotional distress to

Jerry Miller.

## COUNT VII
### (Respondeat Superior Against the City of Chicago)

122. Plaintiff realleges paragraphs 1 through 121 as though fully stated herein.

123. At all times relevant to this complaint the individual defendants acted as agents of,

and in the scope of their employment with, defendant City of Chicago.

124. The City of Chicago is liable for its agents' torts which violated state law under the

doctrine of *respondeat superior*.

## COUNT VIII
### (745 ILCS 10/9-102 Claim Against the City of Chicago)

125. Plaintiff realleges paragraphs 1 through 124.

126. Defendant City of Chicago was the employer of all defendants at all times relevant

to this complaint.

127. Defendants committed the acts alleged above in the scope of their employment as

employees of the City of Chicago.

22

128.  Pursuant to 745 ILCS 10/9-102 the City of Chicago is liable to pay all judgments and settlements in this case.

**DAMAGES**

129.  The actions of the defendants deprived plaintiff Jerry Miller of his civil rights under the fourth, fifth, sixth, eighth and fourteenth amendments to the United States Constitution, and laws of Illinois.

130.  The unlawful, intentional, wilful, deliberately indifferent, reckless and/or bad-faith acts and omissions of the defendants caused Jerry Miller to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and to be imprisoned and subjected to parole restrictions for more than twenty five years for a crime he did not commit.

131.  The unlawful, intentional, wilful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Jerry Miller the following injuries and damages: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, many of which continue to date and will continue in the future, for which he is entitled monetary relief.

132.  All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, and/or

with bad faith, and warrant the imposition of punitive damages against the individual defendants.

**WHEREFORE**, Jerry Miller prays as follows:

     A.   That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

     B.  That the Court award punitive damages to him, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

     C.  For a trial by jury;

     D.  For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

     E.  For any and all other relief to which he may be entitled.

Respectfully submitted,

November 6, 2007

                      /s/ John L. Stainthorp
                      John L. Stainthorp, G. Flint Taylor Jr.
                      People's Law Office
                      1180 N. Milwaukee
                      Chicago, IL 60622
                      773 235-0070
                      773 235-6699 (Fax)
                      Stainthorp@aol.com

                      Peter Neufeld, Nick Brustin, Jennifer Laurin
                      Cochran Neufeld & Scheck LLP
                      99 Hudson Street, 8th Floor
                      New York, New York 10013
                      212 965 9081

**PLAINTIFF DEMANDS TRIAL BY JURY**