IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JERRY MILLER,                          )
                                       )
                    Plaintiff,         )
                                       )      Civil Action No.: 08 C 773
         v.                            )
                                       )      Suzanne B. Conlon, Judge
THOMAS WHALEN, PHILLIP MANNION,        )
KENNETH FLIGELMAN, RAYMOND             )
LENZ, and CITY OF CHICAGO,             )
                                       )
                    Defendants.        )


## MEMORANDUM OPINION AND ORDER

Jerry Miller sues Chicago police officer Kenneth Fligelman, detectives Thomas Whalen

and Phillip Mannion (collectively "police officers"), and Chicago Police Department crime lab

microanalyst Raymond Lenz under 42 U.S.C. § 1983 (Count I), and brings state law claims for

malicious prosecution (Count V) and intentional infliction of emotional distress (Count VI).[1]  In

1982, Miller was wrongfully convicted of rape, robbery, and kidnapping.  After his release from

prison in 2006, DNA testing exonerated him, and established the real perpetrator's identify –

Robert Weeks.  Words are inadequate to describe this tragedy.

---

[1] Miller sues the city for *Monell* and supervisory liability (Counts III and IV), and
*respondeat superior* liability (Counts VII and VIII).  He stipulated to dismiss Counts III and IV
with prejudice.  Dkt. 267.  He sued Chicago police officers Gerald Mahon, Thomas Stevens,
Darryl Depke, and Chicago Police Department crime lab fingerprint examiner Thomas
Krupowicz.  He stipulated to dismiss Mahon, Stevens, and Krupowicz without prejudice.  Dkts.
209 and 212.  On the court's own motion, Depke, who is deceased, was dismissed.  Dkt. 58.

Miller alleges Chicago police officers denied him a fair trial by conducting suggestive identification procedures and withholding exculpatory evidence, fabricated evidence, and arrested and prosecuted him without probable cause. He alleges Lenz denied him a fair trial by withholding exculpatory testing of the perpetrator's semen and fabricated the test results. The police officers move for summary judgment. Lenz separately moves for summary judgment. For the reasons set forth below, the police officers' motion is granted, and Lenz's motion is granted in part.

## BACKGROUND

### I.   Local Rule 56.1

Local Rule 56.1 requires litigants to follow a detailed procedure in filing and responding to summary judgment motions. The movant must submit a statement of material facts, not to exceed 80 short numbered paragraphs; each paragraph must cite affidavits, parts of the record, and other supporting materials relied upon. Local Rule 56.1(a)(3). The opposing party must respond to each numbered paragraph in the movant's statement including, in the case of disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon. Local Rule 56.1(b)(3). Failure to comply with this rule results in admission of the facts. Local Rule 56.1(b)(3)(C); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). The opposing party may also submit a statement of supplemental material facts, not to exceed 40 short numbered paragraphs, that require summary judgment denial. Local Rule 56.1(b)(3)(C).

Rule 56.1 requires *short* paragraphs (one or two individual allegations). The statements and responses must cite supporting evidence. *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill.

2000) (Castillo, J.). In violation of the rule, the parties' statements include multiple allegations, and the parties repeatedly rely on nonresponsive evidence and improper factual and legal characterizations to support their statements and responses. The court considers the parties' submissions only to the extent they comply with Rule 56.1's requirements.

## II.    Background

The following facts are derived from the parties' Local Rule 56.1 statements and exhibits. On the evening of September 16, 1981, R.S. was accosted in a parking garage at 506 North Rush Street in Chicago. Defs. Facts ¶ 4; Pl. Resp. ¶ 4. The perpetrator pushed R.S. into her car, stole her jewelry, punched and choked her, raped her, and forced her into the car's trunk. Defs. Facts ¶ 5; Pl. Resp. ¶5; Pl. Ex. H: September 16, 1981 Police Report. During the rape, the perpetrator ejaculated semen on R.S.'s slip. Pl. Facts (Lenz) ¶ 1; Lenz Resp. ¶ 1. When the perpetrator attempted to leave the parking garage, parking lot attendant Elaine Boston (now deceased) recognized the car; she and parking lot attendant Milton Stewart (now deceased) questioned the perpetrator. Defs. Facts ¶¶ 8-10; Pl. Resp. ¶¶ 8-10. He escaped on foot, and the attendants freed R.S. from the trunk. Defs. Facts ¶¶ 11-12; Pl. Resp. ¶¶ 11-12.

R.S. described the perpetrator to the police. Defs. Facts ¶ 12; Pl. Resp. ¶ 12; Pl. Ex. Q: Robert Elliot Dep. Tr. at 22, 30. The police report states the perpetrator was a black male, 19-23 years old, 5'8", 150 pounds, and wore a hairnet. September 16, 1981 Police Report. But the reporting police officer was not certain this was R.S.'s description. Defs. Ex. I: Elliot Dep. Trans. at 54-55.[2] R.S. was transported to the hospital, and the police report states she would

---

[2] Citations to separate exhibits for the same transcript are necessary because the parties provide piecemeal portions of duplicate transcripts.

view photographs of known offenders when her health permits. September 17, 1981 Police

Report. The attendants described the perpetrator as a black male, medium complexion,

approximately 20-25 years old, between 5'5" and 5'7", 140-160 pounds, sparse facial hair, and

black hair covered by a black hairnet. Defs. Facts ¶ 13; Pl. Resp. ¶ 13. Two days later, the

attendants described the attacker to a sketch artist; the sketch was published in a police bulletin.

Defs. Facts ¶ 14; Pl. Resp. ¶ 14; Defs. Ex. G: Composite Sketch.

Chicago police officers Fligelman and Depke thought the sketch resembled Miller, whom

they had stopped five days before R.S.'s attack, on September 11, 1981, in the Lincoln Park area

of Chicago. Defs. Facts ¶¶ 15-21; Pl. Resp. ¶¶ 15-21. Fligelman testified they were in Lincoln

Park that day because they were assigned to look for a pattern rapist. Pl. Ex. C: Fligelman Dep.

Tr. at 37-38. According to Fligelman and Depke, Miller was looking into cars and wearing a

hairnet. Pl. Ex. G: Trial Tr. at 9-10; Defs. Ex. C: Trial Tr. at 14; Pl. Supp. Ex. D: Fligelman Dep.

Tr. at 144. Miller denies looking into cars or wearing a hairnet, and states he was in the area to

look for a job. Defs. Ex. I: Miller Dep. Tr. at 55-56; Pl. Ex. G: Miller Dep. Tr. at 46-47.

Fligelman and Depke requested identification from Miller. Defs. Facts ¶ 17; Pl. Resp. ¶ 17. A

records search revealed Miller's father's name. Miller explained he lived with his father in

Chicago, and provided the address. Defs. Facts ¶ 18; Pl. Resp. ¶ 18. Miller was not arrested.

Fligelman testified "[t]here may have been a note" about the stop; the record contains no police

reports regarding the stop. Pl. Facts ¶ 2; Defs. Resp. ¶ 2; Defs. Supp. Ex. A: Fligelman Dep. Tr.

at 106-07.

After noting the resemblance between the sketch and Miller, on September 19, 1981,

Fligelman and Depke went to Miller's father's home; he was wearing a black hairnet. Defs.

4

Facts ¶¶ 22-23; Pl. Resp. ¶¶ 22-23.  Miller was arrested.  Detectives Whalen and Mannion

questioned Miller about his whereabouts on the day of R.S.'s attack.  According to the police

report, Miller said he was at the Veterans' Administration hospital for groin pain treatment on the

morning of September 16, 1981 for four hours, went home and slept, and woke in the evening to

watch the famous Hearns-versus-Leonard boxing match but could not because he did not have

pay television.  He instead socialized with his mother, father, and uncle.  September 21, 1981

Police Report.  Whalen states that Miller told him he *did* watch the fight, but the picture was

scrambled.  Pl. Ex. J:  Whalen Dep. Trans. at 294-96.  Miller's trial counsel Sheldon Sorosky

states that records showed Miller did not visit the Veterans' Administration hospital that

morning.  Pl. Supp. Ex. B: Sorosky Dep. Tr. at 174.  Miller's mother stated he never left the

house that day.  September 21, 1981 Police Report.

The next night, on September 20, 1981, Miller stood in a lineup with four "fillers":  a

5'6", 150 pound, 29-year-old black male; a 5'7", 170 pound, 29-year-old black male; a 5'11", 155

pound, 28-year-old black make; and a 6', 150 pound, 31-year-old black male.  Defs. Facts ¶ 33;

Defs. Ex. R: Lineup Photograph.  Miller is black and was 23 years old, 5'7", and 150 pounds.  Pl.

Ex. H:  Lineup Report.  According to the lineup report, parking garage attendant Boston

positively identified Miller, and attendant Stewart tentatively identified Miller.  Def. Facts ¶ 35;

Pl. Facts ¶ 23; Lineup Report.  The lineup report reflects detectives Whalen and Mannion

conducted the lineup, and officers Fligelman and Depke were present.  Lineup Report.  Fligelman

testified he and Depke did not observe the lineup; they were merely present in the area for

possible assistance.  Fligelman Dep. Tr. at 57.

After the lineup, Miller was photographed in his black hairnet. Defs. Facts ¶ 39; Defs. Ex. S: Photograph. Miller testified a police officer told him he planned to show the photograph to someone in the hospital. Pl. Ex. E: Miller Dep. Trans. at 341-43. Miller did not tell Sorosky about the photograph; he attested he did not understand its significance. Pl. Ex. L: Miller Aff. ¶ 2. R.S. remained in the hospital for six days after the attack. Trial Tr. at 247. During that time period, she was shown a "photo array" of four to six young black males and identified two "possibles." Trial Tr. at 245-46.

The semen from R.S.'s slip was submitted to the Chicago Police Department crime lab for testing. Pl. Facts (Lenz) ¶ 2; Lenz Resp. ¶ 2. At the time, crime laboratories used absorption-inhibition testing. Pl. Facts (Lenz) ¶ 12; Lenz Resp. ¶ 12. Approximately 75 to 80 percent of the population are "secretors" – they secrete antigens from their ABO blood type (A, B, AB, or O) in their semen and saliva. Pl. Facts (Lenz) ¶ 11; Lenz Resp. ¶ 11. Absorption-inhibition testing determines whether a person is a non-secretor or secretor, and, if the person is a secretor, his blood type. Pl. Facts (Lenz) ¶¶ 10-11, 41-43; Lenz Resp. ¶¶ 10-11, 41-43. An A blood type has A and H antigens; a B blood type has B and H antigens; an AB blood type has A, B, and H antigens; an O blood type has H antigens. Pl. Facts (Lenz) ¶ 10; Lenz Resp. ¶ 10. Lenz obtained blood and saliva samples from R.S. and Miller in June 1982. Pl. Facts (Lenz) ¶ 6; Lenz Resp. ¶ 6.

Lenz performed absorption-inhibition testing on the semen sample. On August 10, 1982, Lenz concluded that R.S. is an A secretor because testing of R.S.'s salvia showed the presence of A and H antigens; Miller is a B secretor because testing of saliva showed the presence of B

antigens; and testing of the semen on R.S.'s slip yielded "inconclusive findings." Pl. Facts (Lenz) ¶ 14; Lenz Resp. ¶ 14; Pl. Ex. (Lenz) L: August 10, 1982 Lenz Report.

Prior to trial, Miller filed a motion to suppress the in-court and out-of-court identification of Miller. He argued, *inter alia*, that police officers indicated to Boston and Stewart that Miller was the perpetrator. Defs. Ex. X: Motion to Suppress ¶ 4. Regarding the factual basis for this argument, Sorosky testified, "I didn't have anyone who told me anything"; "I was always digging for it"; and "this was the way lawyers pled at the time." Defs. Ex. M: Sorosky Dep. Tr. at 89-90. Miller also argued in the motion to suppress that police activities induced the witnesses to identify Miller. Motion to Suppress ¶ 6. Sorosky testified he had no factual basis for the allegation. Sorosky Dep. Tr. at 126-27. The motion to suppress was denied.

After the jury was selected, prosecutor Dane Cleven disclosed to Sorosky that R.S. had been shown the photo array and identified two "possibles." He did not produce the photo array because it was not preserved. Sorosky Dep. Tr. at 14-17. Sorosky did not request a continuance; he discussed the photo array at a pre-trial hearing: "Apparently, the police went with certain photographs to show her a photo lineup. And I believe she, one of the pictures was the defendant and she said apparently she could not identify anyone." Trial Tr. at 189.

R.S. testified at trial that Miller "looks like" her attacker. Trial Tr. at 226. Sorosky cross-examined R.S. about her inability to identify the attacker from the photo array. She admitted she "wasn't sure" and picked out two "possibles." Trial Tr. at 246-47. In his closing argument, Sorosky argued that R.S. could not identify Miller as her attacker, and criticized the prosecution for not eliciting the identity of the "possibles." Trial Tr. at 488. Both Boston and Stewart identified Miller as the perpetrator. Trial Tr. at 312. On cross-examination, Stewart testified that

7

he was not "a hundred percent sure" when he identified Miller in the lineup. Trial Tr. at 312.

After he "thought a while," it "appeared to [him] that was the person." Trial Tr. at 314. He was

"near a hundred percent" sure of his identification. Trial Tr. at 312. Lenz testified that the slip

tested positive for sperm; he was not questioned about his report. Lenz Ex. B: Trial Tr. at 406-

21.

On October 1, 1982, the jury convicted Miller of rape, robbery, and kidnapping. He was

sentenced to 52 years in prison, and was released from prison in 2006. After his release, DNA

testing of the semen on R.S.'s slip exonerated Miller and established Robert Weeks committed

the crimes against R.S. Pl. Facts ¶ 1; Defs. Resp. ¶ 1. Miller's conviction was vacated on April

23, 2007, and he was pardoned on October 30, 2008, Pl. Add. Facts ¶ 1; Defs. Resp. ¶ 1.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving

party has the initial burden of demonstrating that it is entitled to summary judgment. *Kramer v.*

*Vill. of N. Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004) (citing *Celotex Corp.*, 477 U.S. at

323). Once a moving party has met its burden, the nonmoving party must go beyond the

pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P.

56(e); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The court considers the record

as a whole and draws all reasonable inferences in the light most favorable to the nonmoving

8

party. *See Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002). A genuine issue of
material fact exists when the evidence is sufficient to support a reasonable jury verdict in favor of
the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. Police Officers

### A. Section 1983 Denial of Fair Trial (Count I)

#### 1. Lineup and Photo Array

The police officers argue the lineup and photo array were not unduly suggestive and did
not impact the trial. The due process clause protects against the admission of evidence derived
from unduly suggestive identification procedures. *Alexander v. City of South Bend*, 433 F.3d
550, 555-56 (7th Cir. 2006). The right to a fair trial is violated if unduly suggestive identification
procedures taint the trial. *Id.* at 555.

Miller contends the physical characteristics of the fillers in the lineup rendered it unduly
suggestive. A lineup does not require five persons with identical measurements and
countenances. *United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996). It is undisputed that
Miller and the other participants in the lineup were males, black, between 5'6" and 6', between
150 and 170 pounds, and between 23 and 31 years old. Miller was the same height as a filler,
one inch taller than a filler, and four to five inches shorter than two fillers. He weighed the same
as two fillers, was five pounds lighter than a filler, and was 20 pounds lighter than a filler. The
parity level establishes the lineup was not unduly suggestive. *See, e.g., United States v. Traeger*,
289 F.3d 461, 474 (7th Cir. 2002); *United States v. Curry*, 187 F.3d 762, 767-68 (7th Cir. 1999);
*Funches*, 84 F.3d at 253. Miller states he was the only lineup participant without a shirt under
his jacket. He presents no evidence or argument this rendered the lineup unduly suggestive.

9

Miller argues that Stewart only became positive of his identification after Whalen talked

to him, citing Whalen Dep. Tr. at 271-72, 276-77 and Trial Tr. at 314, 319-20. The record does

not support this statement. In response to questioning about whether Whalen talked to the

witnesses after the lineup, Whalen testified he was sure he spoke to them but did not recall

speaking to them about substantive matters. Whalen Dep. Tr. at 271. Stewart testified at trial

that he was not "a hundred percent sure" when he identified Miller in the lineup, but after he

"thought a while," it appeared Miller was the perpetrator. Trial Tr. at 312, 314. He was sure of

his identification of Miller when he left the police station after the lineup. Trial Tr. at 319-20.

Sorosky had no factual basis to argue the police induced Stewart to identify Miller. Sorosky

Dep. Tr. at 126-27. Miller presents no genuine issue of material fact that the lineup was unduly

suggestive.

The police officers argue they are entitled to qualified immunity for the unduly suggestive

lineup claim, citing the Chicago Police Department's General Order, effective in 1981, that a

lineup should consist of at least five people with the same general height, weight, hair color, and

skin color. Defs. Ex. Q: General Order. Qualified immunity protects government officials

performing discretionary functions from civil damages unless their conduct violates clearly

established statutory or constitutional rights obvious to a reasonable person. *Pearson v.*

*Callahan*, 129 S. Ct. 808, 815 (2009). The argument need not be addressed because Miller does

not present a genuine issue of material fact that the police officers violated his constitutional

rights by conducting an unduly suggestive lineup.

Miller argues the photo array was unduly suggestive. He asserts without evidentiary

support that the photo array included a photograph of Miller in a hairnet, and the individuals in

10

the other photographs did not wear hairnets. It is undisputed the photo array was not preserved; the record merely establishes the array included photographs of four to six young black males. But even if Miller's description of the array is accurate, it is undisputed R.S. was not able to make a conclusive identification, and the photo array was never introduced at trial. The prosecution did not question R.S. or the police officers about the array. Sorosky questioned R.S. about the array during cross-examination and established she could only identify two "possibles." Miller presents no evidence the photo array tainted the trial. Viewing the evidence in the light most favorable to Miller and drawing all reasonable inferences in his favor, he fails to present a genuine issue of material fact that the lineup and photo array deprived him of a fair trial.

### 2. Suppression of Photo Array

The police officers argue they did not withhold evidence about the photo array. A § 1983 claim may be based on denial of a fair trial where the prosecution withholds exculpatory or impeaching evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The duty extends to police officers to disclose exculpatory or impeaching evidence to the prosecution. *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). To establish a *Brady* violation, Miller must show the police officers suppressed the evidence; the evidence is favorable to him because it is either exculpatory or impeaching; and the suppressed evidence is material – it resulted in prejudice, or a reasonable probability that the evidence would have produced a different verdict. *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007).

Initially, the police officers argue they are not liable for a *Brady* violation because they did not personally show R.S. the photo array or fail to document or disclose the photo array to the prosecution. To establish a § 1983 claim, Miller must show the police officers caused or

11

personally participated in the alleged constitutional deprivations. *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). The parties dispute who showed R.S. the photo array. According to Miller, Whalen and Mannion showed R.S. the photo array. During R.S.'s cross-examination, Sorosky specifically asked: "[W]hile you were at the hospital didn't two other police officers who were detectives, Detectives Whalen and Mahon show you a group of photographs of young black men?" R.S. responded affirmatively. Trial Tr. at 246-47.

Sorosky does not recall the reason he identified Whalen and Mahon during cross-examination; he believes he mistakenly referred to "Mahon." Sorosky Dep. Tr. at 60. He does not recall whether the prosecutor identified the individuals. Sorosky Dep. Tr. at 17. Miller contends that a reasonable inference may be drawn that Sorosky mistook "Mahon" for Whalen's partner Mannion – a similarly sounding last name. Whalen does not recall meeting R.S. or showing her the photographs. Pl. Ex. J: Whalen Dep. Tr. at 81. Mannion and Fligelman deny showing the photographs to R.S. Def. Ex. N: Mannion Dep. Tr. at 84; Def. Ex. H: Fligelman Dep. Tr. at 245.[3]

Viewing the evidence in the light most favorable to Miller, and drawing all reasonable inferences in his favor, there is a genuine issue of material fact regarding Whalen and Mannion's personal involvement in showing R.S. the photo array. A reasonable inference may be drawn from Sorosky's reference to Whalen and "Mahon" during R.S.'s cross-examination and R.S.'s response that Whalen and Mannion showed her the photo array. Mannion denies showing the photo array to R.S., but this is a question of fact that cannot be resolved on summary judgment.

---

[3] Miller admits that Fligelman denies showing the photographs to R.S. Pl. Resp. ¶ 63. The cited page of Fligelman's deposition transcript, however, is omitted from the record.

The police officers argue evidence about the photo array R.S. viewed was not suppressed because Miller knew about the photo array prior to trial. Evidence is suppressed when the prosecution fails to disclose it in sufficient time for a defendant to utilize it, and the evidence was not otherwise available to the defendant through the exercise of reasonable diligence. *Carvajal*, 542 F.3d at 567.

Miller was photographed in his hairnet after the lineup. He admits a police officer told him that the photograph would be shown to someone at the hospital, but he did not provide this information to his attorney. Miller argues disclosure to him is insufficient; the state was required to disclose the evidence to his attorney, citing *United States ex rel. Raymond v. Illinois*, 455 F.2d 62 (7th Cir. 1971). Raymond was convicted of rape and robbery. His attorney learned for the first time at the sentencing hearing about a laboratory report that was negative for sperm on Raymond's clothes. But a police officer told Raymond about the negative report the day after his arrest. Denial of Raymond's habeas corpus petition was reversed because disclosure to Raymond was held insufficient to satisfy the prosecution's *Brady* obligations. The *Brady* duty to disclose does not create a burden on defense counsel to specifically request the information from his client. *Id.* at 66-67.

The police officers argue subsequent case law abrogates this principle, citing *Harris*, 486 F.3d 1010, and *Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003), *overruled in part on other grounds by Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006). Harris was convicted of armed robbery and attempted murder, served twenty years in prison, and received a pardon after others confessed to the crime. He sued police officers under § 1983 based on, *inter alia*, their alleged failure to disclose his alibi for a related store shooting. Summary judgment for the police

13

officers was affirmed because Harris' own alibi could not have been concealed from him. *Id.* at 1015-16.

Gauger was convicted of murder; the state appellate court reversed his conviction and ordered a new trial because the statements he made during interrogation were the fruit of his unlawful arrest. *Gauger*, 349 F.3d at 357-58. He was never retried. Gauger sued detectives under § 1983 for failing to provide truthful accounts of the statements he made during interrogation. Summary judgment for the detectives on this issue was affirmed because useful evidence was not concealed; Gauger knew what he said at the interrogation. *Id.* at 359-60.

Neither *Harris* nor *Gauger* cite *Raymond* or abrogate its holding that defense counsel is not required to request exculpatory information from a client. The evidence in *Harris* and *Gauger* – an alibi and custodial statements – is distinct from the evidence in *Raymond* – a laboratory report negative for sperm on defendant's clothes in a rape case. An alibi or custodial statement are information in defendant's possession, and a reasonable inference may be drawn that defense counsel would elicit this information from the accused during the course of representation. The exculpatory laboratory report in *Raymond*, like the results of the photo array shown to R.S., were in the prosecution's possession; there was a *Brady* duty to produce the evidence to defense counsel.

Even if disclosure of exculpatory evidence to Miller was sufficient, the record demonstrates that Miller knew his photograph was taken to show someone in the hospital. But there is no evidence he was told a photo array was later shown to R.S. It is undisputed that Sorosky did not learn about the photo array until trial. Under these circumstances, the police

14

officers' disclosure to Miller that his photograph would be shown to someone at the hospital does not satisfy their *Brady* obligations.

The police officers nevertheless argue that evidence about the photo array was not suppressed because the prosecutor disclosed the information to Sorosky at trial. After the jury was selected, the prosecutor told Sorosky that R.S. was shown a photo array of four to six young black males and she identified two "possibles." The timing of the prosecutor's disclosure – after jury selection – does not support a *Brady* violation because the record demonstrates Sorosky did not request a continuance to interview R.S. or the police officers about the photo array. *United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007) (argument that the prosecution did not timely disclose exculpatory evidence was undermined by defendant's failure to request a continuance).

Late disclosure of exculpatory evidence, even during trial, does not establish a *Brady* violation if a defendant had the opportunity to use the evidence to his advantage. *Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008). Miller does not refute that Sorosky used evidence about the photo array at trial. He cross-examined R.S. about her inability to identify the attacker; she admitted she "wasn't sure" and picked out two "possibles." Trial Tr. at 246-47. Sorosky emphasized in his closing argument that R.S. could not identify her attacker from the photo array. Trial Tr. at 488. The undisputed facts demonstrate evidence about the photo array was not suppressed.

Miller argues the photo array itself was suppressed because it was destroyed. The record does not include the circumstances surrounding the failure to preserve the photo array. The police officers contend the exculpatory potential of the photo array is speculative, citing *United*

15

*States v. Roberts*, 534 F.3d 560 (7th Cir. 2008); *United States v. Mitchell*, 178 F.3d 904 (7th Cir. 1999); and *United States v. Morris*, 957 F.2d 1391 (7th Cir. 1992). These cases, however, involve speculation about whether the allegedly suppressed evidence *existed*. *Roberts*, 534 F.3d at 572; *Mitchell*, 178 F.3d at 907; and *Morris*, 957 F.2d at 1402-03. It is undisputed that a photo array existed, was shown to R.S., and was not preserved.

But even if Miller presented evidence that R.S. was shown an array including Miller's photograph and failed to identify him, the police officers argue the evidence was not material, citing *Richardson v. Briley*, 401 F.3d 794 (7th Cir. 2005). Richardson sought habeas corpus relief because he did not call a favorable defense identification witness after the prosecutor falsely represented impeachment evidence about the witness. The grant of Richardson's habeas corpus petition was reversed because there was no reasonable probability that Richardson would have been acquitted; four witnesses identified Richardson as the perpetrator. *Id.* at 802-03.

The record reflects that both Boston and Stewart, who conversed in close proximity with the perpetrator at the parking garage, identified Miller. Sorosky elicited R.S.'s testimony that she could not identify the perpetrator from the photo array. R.S.'s failure to identify Miller could have been explained by her testimony that the perpetrator told her he would kill her if she opened her eyes. Trial Tr. at 242. Viewing the evidence in the light most favorable to Miller, and drawing all reasonable inferences in his favor, he presents no genuine issue of material fact that he was prejudiced by the failure to preserve the photo array.

16

**B.     Section 1983 Substantive Due Process**

The police officers argue Miller's substantive due process claim is not legally viable. Miller contends the police officers violated his substantive due process rights by fabricating inculpatory evidence against him. Miller did not allege this claim in his complaint.

A substantive due process claim is not permissible when a specific constitutional provision protects the right allegedly violated. *McCann v. Mangialardi*, 337 F.3d 782 (7th Cir. 2003). Denial of summary judgment on McCann's § 1983 claim that a police officer created false evidence to secure his conviction was reversed. The claim was considered a substantive due process challenge that could not proceed because the fourth amendment protects the right allegedly violated. *Id.* at 786. It was also considered a malicious prosecution claim that was barred because existence of a tort claim under state law precludes a constitutional theory of malicious prosecution; Illinois provides a common law tort action for malicious prosecution. *Id.* (citing *Newsome v. McCabe*, 256 F.3d 747, 750 (7th Cir. 2001)). McCann could not convert a fourth amendment false arrest claim and malicious prosecution claim into a substantive due process claim. *Id.* Miller's substantive due process claim for fabricating false evidence is precluded under *McCann*. Indeed, Miller seemingly revives his previously dismissed Count II – a § 1983 malicious prosecution claim. Count II was dismissed with prejudice because the claim was not viable under *Newsome*. Dkt. 71.

Miller presents no genuine issue of material fact that the police officers fabricated inculpatory evidence. He asserts Fligelman and Depke failed to document the September 11, 1981 stop, and denies wearing a hairnet or looking into cars. But Miller does not dispute that Fligelman and Depke thought the police sketch resembled Miller, and that Miller was wearing a

hairnet when they went to Miller's father's home. Miller argues Whalen coerced Stewart to identify Miller, but presents no supporting evidence.

The September 21, 1981 police report recounts Miller's initial statement that he did not watch the boxing match. Whalen states Miller told him he watched the fight, but the picture was scrambled. Miller argues this demonstrates Whalen lied about Miller's alibi statement to inculpate him. The same police report recounts Miller later explained that he and his family watched the fight but could not see it well because they had not timely ordered it. Whalen's testimony does not conflict with the police report. Miller presents no genuine issue of material fact that Whalen fabricated evidence to discredit his alibi. The record demonstrates Miller's statement that he was at the Veterans' Administration hospital on the morning of September 16, 1981 was contradicted by hospital records and his mother's statement. Viewing the evidence in the light most favorable to Miller, and drawing all reasonable inferences in his favor, Miller presents no genuine issue of material fact that the police officers fabricated inculpatory evidence.

### C.     Malicious Prosecution (Count V)

The police officers argue Count V for malicious prosecution is barred because they had probable cause to arrest and charge Miller. To establish a malicious prosecution claim, Miller must show the police officers commenced or continued an original criminal or civil judicial proceeding against him; the action terminated in his favor; the police officers lacked probable cause; the police officers acted with malice; and damages. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921-22 (7th Cir. 2001) (citing *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). Probable cause provides a complete defense to malicious prosecution claims. *Id.* at 926.

18

It is undisputed Miller matched the witnesses' physical description of R.S.'s attacker; that Fligelman and Depke believed Miller resembled the police sketch; that Miller was stopped five days prior to R.S.'s attack in a neighboring area; and that Miller was wearing a black hairnet like the perpetrator when Fligelman and Depke went to his father's home. Under these circumstances, probable cause to arrest was established. *See, e.g., People v. Smith*, 576 N.E.2d 186, 192 (Ill. App. Ct. 1991) (there was probable cause to arrest defendant who fit general description of suspect, looked like police sketch, and was in vicinity of area where crimes occurred). Miller does not dispute Boston's identification of him as the person she believed was in R.S.'s car. Her identification provided probable cause to prosecute Miller. Viewing the evidence and all reasonable inferences in Miller's favor, he fails to present a genuine issue of material fact that the police officers lacked probable cause.

### D.     Intentional Infliction of Emotional Distress (Count VI)

The police officers argue Miller's Count V for intentional infliction of emotional distress ("IIED") claim is barred by the one-year statute of limitations set forth in the Illinois Tort Immunity Act, 745 ILCS 10/8-101. IIED is a continuing tort under Illinois law; the cause of action accrues, and the statute of limitations begins to run, when the last injurious act occurs or the conduct is abated. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 88-89 (Ill. 2003). Miller's conviction was vacated on April 23, 2007; he filed the complaint on February 5, 2008 – within the one-year statute of limitations. His IIED claim is timely. *See, e.g., Cannon v. Burge*, No. 05 C 2192, 2006 WL 273544, at *10 (N.D. Ill. Feb. 2, 2006) (St. Eve, J.) (IIED claim accrued when charges against Cannon were dismissed); *Orange v. Burge*, No. 04 C 0168, 2005 WL 742641, at

*8-9 (Mar. 30, 2005) (Holderman, J.) (IIED claim accrued when Orange was released from prison and pardoned).

The police officers argue their conduct was not extreme and outrageous because they were pursuing legitimate law enforcement activities. To establish an IIED claim, Miller must show: (1) the police officers' conduct was extreme and outrageous; (2) they intended to inflict severe emotional distress, or knew there is a high probability the conduct would cause severe emotional distress; and (3) the conduct caused severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).

Miller argues the police officers' suppression of exculpatory evidence and fabrication of inculpatory evidence was extreme and outrageous. He presents no genuine issue of material fact that evidence about the photo array was suppressed. And he presents no genuine issue of material fact that the police officers fabricated inculpatory evidence. He does not present evidence supporting a finding of extreme and outrageous conduct.

## III.  Lenz

### A.  Section 1983 Denial of Fair Trial (Count I)

Lenz moves for summary judgment on the § 1983 deprivation of a fair trial claim (Count I). He characterizes it as a conspiracy claim, and argues Miller presents no evidence that defendants conspired to convict him. Miller presents no evidence of a conspiracy, and does not argue a conspiracy existed. Summary judgment in favor of defendants on the conspiracy claim is granted. But Miller alleges and argues defendants individually denied him a fair trial. Compl. ¶¶ 93-105. According to Miller, Lenz failed to disclose exculpatory results of the semen testing in violation of *Brady*.

Lenz does not dispute that *Brady* obligations extend to a crime lab analyst. *See Wardell v. City of Chicago*, 75 F. Supp. 2d 851, 855 (N.D. Ill. 1999) (Castillo, J.) (applying *Brady* analysis to Chicago Police Department laboratory employee). Lenz argues he did not suppress the test results; he documented his findings in a laboratory report. Lenz's absorption-inhibition testing of the semen on R.S.'s slip yielded "inconclusive findings." August 10, 1982 Lenz Report. In 2009, Dr. Edward Blake, an undisputed expert on absorption-inhibition testing, retested four separate portions of the semen sample on R.S.'s slip with the same method Lenz used in 1982. It is undisputed his testing yielded no antigenic activity. Pl. Ex. D: April 20, 2009 Dr. Blake Report at 50-51.[4]

According to Dr. Blake, Lenz's inconclusive findings on the semen sample are inconceivable because of the sample's freshness in 1982, large size, and concentration. Lenz tested the semen, and knew that the failure to find B antigens on R.S.'s slip would eliminate Miller as the semen source. Lenz failed to detect B antigens on the slip, but nevertheless characterized the finding as inconclusive, and did not retest. April 20, 2009 Dr. Blake Report at 52-53.

Lenz argues Dr. Blake's report is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). He raises the argument for the first time in his reply brief. Arguments raised for the first time in a reply brief are waived. *Kelso v. Bayer Corp.*, 398 F.3d 640, 643 (7th Cir. 2005). He does not challenge Dr. Blake's credentials or the validity of

---

[4] Dr. Blake tested the real perpetrator Weeks' saliva; he is either a non-secretor or a low-level O secretor. One swab revealed no antigenetic activity; a second swab revealed a low level of H antigens. Blake recommends retesting with a more saturated sample. Dr. Blake Report at 50.

his methodology. Indeed, it is undisputed Dr. Blake tested the semen using the same absorption-inhibition method Lenz used in 1982. Lenz presents no basis to exclude Dr. Blake's report under *Daubert*. Lenz argues Dr. Blake's opinions are not sufficient to preclude summary judgment because they are speculative and unsupported. He contends Dr. Blake speculates about the condition of the sperm sample in 1982. But Lenz fails to present evidence that the sperm was not preserved. An expert's "naked conclusion" without any supporting factual basis does not preclude summary judgment. *Weigel v. Target Stores*, 122 F.3d 461, 468-69 (7th Cir. 1997). Dr. Blake's conclusion that Lenz failed to detect B antigens and mischaracterized the finding as inconclusive is supported by his testing of the semen sample.

Lenz received the semen sample in March 1982 but did not test it until after he received the blood and saliva samples from R.S. and Miller. Pl. Ex. E: March 10, 1982 Lenz Report. Lenz explicitly reported that R.S. was an A secretor because testing of her salvia showed the presence of A and H antigens, and that Miller was a B secretor because testing of his saliva showed the presence of B antigens. But he generally reported the semen testing yielded inconclusive findings. He did not report any presence or absence of antigens. August 10, 1982 Lenz Report. Lenz's original file and notes were not preserved. He does not recall his testing results. He does not recall whether or not he viewed antigenetic activity. Pl. Ex. B: Lenz Dep. Tr. at 285-86. Lenz concedes that his practice would "probably" have been to retest a sample that yielded inclusive results. Lenz Dep. Tr. at 124. He does not present evidence he retested the semen on R.S.'s slip.

Lenz argues Sorosky failed to challenge the inconclusive findings. *Brady* requires defense counsel's reasonable diligence in acquiring exculpatory evidence. *Carvajal*, 542 F.3d at

22

567. But defense counsel is not required to "scavenge for hints of undisclosed *Brady* material."
*Banks v. Dretke*, 540 U.S. 668, 695 (2004). The record demonstrates Sorosky had no basis at the
time to question the validity of Lenz's testing. Viewing the evidence in the light most favorable
to Miller, and drawing all reasonable inferences in his favor, he presents a genuine issue of
material fact whether Lenz intentionally failed to disclose an absence of antigens in the semen on
R.S.'s slip.

Lenz argues the test results were not exculpatory or material. But he admits the absence
of antigens demonstrates the perpetrator was not a B secretor. Pl. Ex. B: Lenz Dep. Tr. at 285.
Miller is a B secretor. August 10, 1982 Lenz Report. A reasonable inference may be drawn that
the absorption-inhibition testing, available and conducted by Lenz in 1982, could have ruled
Miller out as the perpetrator. There is evidence of a reasonable probability that the test results
would have produced an acquittal notwithstanding the eyewitness testimony.

### B.    Section 1983 Substantive Due Process

Miller argues he was denied substantive due process because Lenz fabricated the test
results of the semen on R.S.'s slip. Miller did not allege this claim in his complaint, and it is not
legally viable. *McCann*, 337 F.3d at 786; *Newsome*, 256 F.3d at 750.

### C.    Malicious Prosecution (Count V)

Lenz did not move for summary judgment on Count V for malicious prosecution, but
argues this in his reply brief. He states he did not know Count V was directed at him. He
nevertheless answered Count V. Dkt. 61.

Lenz argues he is entitled to summary judgment because probable cause to arrest and
prosecute Miller existed. Probable cause is a defense to malicious prosecution claims. *Logan*,

246 F.3d at 926. The record demonstrates no genuine issues of material fact that the *police officers* had probable cause to arrest and charge Miller for R.S.'s attack; Miller presents no evidence the police officers knew about the alleged exculpatory test results. *See Johnson v. Saville*, No. 08-4314, 2009 WL 2244184, at *6 (7th Cir. 2009) (probable cause is based on the totality of the circumstances, including the amount of evidence available to a police officer). But there is a genuine issue of material fact whether the test results of the semen on R.S.'s slip exculpated Miller, and whether Lenz intentionally concealed the exculpatory information. A resulting prosecution is attributable to someone who knowingly makes a false report to the prosecution. *Allen v. Berger*, 784 N.E.2d 367, 370 (Ill. App. Ct. 2002). Accordingly, summary judgment is not appropriate on the malicious prosecution claim against Lenz.

### D.      Intentional Infliction of Emotional Distress (Count VI)

Lenz did not request summary judgment on Count VI for IIED until his reply brief. He states he did not know Count V was directed at him; he answered Count VI. Dkt. 61.

Lenz argues Miller presents no evidence of extreme and outrageous conduct. *McGrath*, 533 N.E.2d at 809. The record demonstrates a genuine issue of material fact whether Lenz intentionally failed to disclose exculpatory results of the semen testing and fabricated the test results. Viewing the evidence and reasonable inferences in Miller's favor, he presents evidence of extreme and outrageous conduct.

### CONCLUSION

The police officers are entitled to summary judgment on Count I for § 1983 denial of a fair trial because Miller presents no genuine issue of material fact that the lineup and photo array were unduly suggestive or tainted his trial. He presents no genuine issue of material fact that

evidence about the photo array was suppressed or material. And he presents no evidence of a conspiracy. The police officers are entitled to summary judgment on Miller's substantive due process claim because it is not legally viable, and Miller presents no genuine issue of material fact that the police officers fabricated evidence. Summary judgment is granted to the police officers on Count V for malicious prosecution because the undisputed facts demonstrate probable cause to arrest and prosecute Miller. Summary judgment is granted to the police officers on Count VI for IIED because Miller presents no genuine issue of material fact that the police officers fabricated evidence.

Lenz is entitled to summary judgment on the § 1983 conspiracy to deny a fair trial claim (Count I) because he presents no evidence of a conspiracy. Lenz is not entitled to summary judgment on the § 1983 denial of fair trial claim (Count I) because Miller presents a genuine issue of material fact that Lenz failed to disclose exculpatory results of the semen testing. Lenz is entitled to summary judgment on Miller's substantive due process claim because it is not legally viable. Summary judgment is denied on Count V for malicious prosecution because the disputed exculpatory nature of the semen test results creates a genuine issue of material fact regarding Lenz's intentional concealment of exculpatory evidence and fabrication of his testing results. Summary judgment for Lenz is denied on Count VI for intentional infliction of emotional distress because Miller presents a genuine issue of material fact regarding Lenz's disclosure and fabrication of the semen test results, and whether Lenz's conduct was extreme and outrageous.

ENTER:

Suzanne B. Conlon
United States District Judge

August 6, 2009