UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

JERRY MILLER,  )
              )
    Plaintiff, )     No. 08 C 773
              )
v.            )     Judge Conlon
              )
RAYMOND LENZ, )     Magistrate Judge Cole
              )
    Defendants.)

**MEMORANDUM OPINION AND ORDER**

Almost ninety years ago, Learned Hand famously wrote of the "ghostly phantom of the innocent man falsely convicted." *DiCarlo v. United States*, 6 F.2d 364, 368 (2nd Cir. 1925). And while "[o]ur procedure has been always haunted by th[at] ghost," it was, he thought, "an unreal dream." *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y. 1923). Two decades later, however, in his elegiac opinion in *United States v. Rubenstein*, 151 F.2d 915, 923 (2nd Cir. 1945) he said:

> A jury trial unquestionably has defects. At best, such a trial, especially as now conducted- i.e., as if it were a game or sporting event- is an imperfect, all-too-human, instrument for ascertaining the true facts of a case. As Borchard reported several years ago and as current discussion in the press of the recent Campbell case dramatically reminds us, occasionally it is discovered that an innocent man, after a jury trial, has been convicted and sent to jail or put to death by the government. No one can doubt that there have been undiscovered instances (no one knows how many) of convictions of the innocent. Unfortunately, some tragedies of that kind are bound to occur. I, for one, do not care to accept responsibility for any such miscarriage of justice which, with reasonable precautions, could have been avoided. (footnotes omitted).

The astonishing advances in modern scientific testing, coupled with the dedication of those admirable members of the bar who have devoted themselves to establishing the innocence of mistakenly convicted defendants, have shown that the innocent man falsely convicted is not a

"ghostly phantom" and that grave injustices do arise more often than had previously been thought. Being administered by fallible men and women, it could scarcely be otherwise. "All systems of law, however, wise, are administered through men, and therefore may occasionally disclose the frailties of men. Perfection may not be demanded of law, but the capacity to correct errors of inevitable frailty is the mark of a civilized legal mechanism." Frankfurter, The Case of Sacco and Vanzetti, 108 (Universal Library ed. 1962).

This case involves a grave injustice and demonstrates the capacity of our legal system to rectify a terrible wrong. The plaintiff spent more than 25 years in prison for a rape that all now concede he did not commit and for which he has been officially exonerated.[1] He has sued for damages. The question the jury in the civil trial that is to begin on February 22nd will be asked to decide is whether his conviction and incarceration stemmed from an innocent error made by Mr. Lenz, the microanalyst who tested the semen found on the rape victim's clothing, rather than an intentional perversion by Mr. Lenz of the test results. In stark and uncompromising language, the Complaint alleges that his conviction was the direct result of the unlawful efforts by Chicago police officers and City of Chicago employees, acting individually and in concert, pursuant to municipal policies and customs, to use any means necessary to gain a conviction. As it pertains to Mr. Lenz, the complaint charges that he fabricated the results of forensic testing by reporting certain results as "inconclusive," when in fact "the testing of the semen [found on the victim's slip] yielded results which were inconsistent with the guilt of Jerry Miller, but these results were not reported as such

---

[1] On April 23, 2007, Mr. Miller was exonerated of the charges of rape, aggravated kidnaping and robbery. All charges against him were dismissed. The exoneration was based on DNA testing, which conclusively established Mr. Miller's innocence and ultimately showed that Robert Weeks was the perpetrator.

2

by... Lenz." (*See* Complaint, ¶ 70; *see also* ¶¶ 6, 9, 67-76, 92, 119).

The Complaint left no doubt that the testing methods employed by Mr. Lenz in 1982 and his interpretation of the results would be the pivotal issues in the case. Given the highly technical nature of those questions, experts would obviously be necessary and would play a central role at trial, for only they would have the scientific, technical, and specialized knowledge required to aid the jury. *See* Advisory Committee Note to Rule 702, Federal Rules of Evidence. On their testimony could hinge the outcome of the case. But all too often, the "experts" are "'the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face that cannot now be proved by some so-called experts.'" *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 382 (7th Cir.1986) (Posner, J.). *See also Emerald Investments Ltd. Partnership v. Allmerica Financial Life Insurance. & Annuity Co.*, 516 F.3d 612 (7th Cir. 2008); *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997)(the expert's opinion "exemplifies everything that is bad about expert witnesses in litigation. It is full of vigorous assertion..., carefully tailored to support plaintiffs' position but devoid of analysis."); *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir.1989) (the expert "cast aside his scholar's mantel and became a shill for Mid-State. Judge Hart, by observing that the emperor has no clothes, protected the interests of the judicial system"); *Karn v. Ingersoll-Rand Co.*, 168 F.R.D. 633, 639 (N.D.Ind.1996); Huber, Galileo's Revenge, Junk Science in the Courtroom, 206-09 (1991); 29 Wright and Gold, Federal Practice and Procedure, § 6262 at 183 (1997); Weinstein, *Improving Expert Testimony*, 20 U.Rich.L.Rev. 473, 482 (1986)("An expert can be found to testify to the truth to almost any factual theory, no matter how frivolous."); Graham, *Expert Witness Testimony and the*

3

*Federal Rules of Evidence: Insuring Assurance of Trustworthiness* (1986) Ill.L.Rev. 43, 45 ("Today practicing lawyers can locate quickly and easily an expert witness to advocate nearly anything the lawyers desire."); Huber, *Safety and the Second Best: The Hazards of Public Risk Management in the Courts*, 85 Colum.L.Rev. 277, 333 (1985)("A Ph.D. can be found to swear to almost any 'expert' proposition no matter how false or foolish.").

Of course, the plaintiff's extraordinarily able lawyers were aware of the importance of the experts in this case and of the obvious fact that whose testimony the jury credited would depend upon its assessment of the experts' general credibility and their competency and experience in Absorption/Inhibition testing, among other things.[2] They knew, of course, of the criticality of the role vigorous cross-examination of the respective experts would play in the case, for the Supreme

---

[2] Principal counsel for Mr. Miller are John Stainthorp of the People's Law Offices, in Chicago, and Peter Neufeld of the New York firm of Neufeld, Scheck & Brustin, LLP. Mr. Stainthorp is the Managing Partner of the People's Law Office in Chicago. According to the Firm's website, he has for more than 25 years represented plaintiff's "who have been wrongfully imprisoned, false [sic] arrested or subjected to excessive force by police officers... These cases have led to significant systemic reforms in police departments nationwide and numerous large monetary settlements for our clients."

Mr. Neufeld and his partner, Barry Scheck, co-founded and co-direct The Innocence Project at the Benjamin N. Cardozo School of Law. The Firm's website proudly asserts that the Project represents hundreds of inmates seeking post-conviction release and has been responsible in the 15 years of its existence for exoneration of most of the more than 200 men it has represented in post-conviction matters involving DNA testing. Mr. Neufeld and Mr. Scheck (who achieved national attention for his involvement in the O.J. Simpson case) formed with the late Johnnie L. Cochran, Jr., the Firm, formerly Cochran Neufeld & Scheck, LLP, in 1998, to formalize their efforts to address individual and systemic civil rights violations nationwide.

According to their website, Mr. Neufeld and the Firm represent those who have been victims of police, prison and other forms of official misconduct, as well as those who have been wrongfully convicted. The Firm's website states that the Firm has successfully represented numerous clients in wrongful conviction cases against police departments throughout the country. "These cases have led to significant systemic reforms in police departments nationwide and numerous large monetary settlements for our clients." Mr. Neufeld, according to the Firm's website, has had almost 30 years of trial experience in the state and federal courts nationwide and has obtained numerous substantial verdicts and settlements in wrongful conviction cases.

Court has stressed its role in attacking shaky but admissible evidence. *Daubert v. Merrell Dow Pharmaceuticals, inc.*, 509 U.S. 579, 596 (1993). And finally, they of course knew that their ability to cross-examine comprehensively would depend upon how they utilized the expansive discovery allowed by the Federal Rules of Civil Procedure, *Fast Food Gourmet Inc. v. Little Lady Foods, Inc.*, 2007 WL 2156665 at * 11(N.D.Ill. 2007), to obtain information pertaining to the experts' familiarity with the Absorption/Inhibition testing method.

On July 6, 2009, the defendants disclosed Arthur Young as their expert. His 6 ½ page single spaced report discusses at length the Absorption/Inhibition method of testing and forcefully rejected the opinion of the plaintiff's expert that Mr. Lenz's conclusion that the 1982 semen testing yielded "inconclusive" results was not sustainable on any level. In paragraph after paragraph he explained why Mr. Lenz's conclusion was an appropriate one. He pointedly rejected as an "unreasonable criticism" the plaintiff's expert's opinion that Mr. Lenz should not have waited until a suspect was developed and reference samples were submitted. In ¶5.7.2 of the Report, he explains why nothing in Mr. Lenz's methodology or conclusions supports a finding of maliciousness and in ¶7.1.1 he rejects the plaintiff's expert's "use of terms like 'forensic malfeasance' and 'scientific fraud' as being 'well beyond the boundaries of the practices and the protocols of forensic science, especially when dealing with a case" from 1982.[3]

Whether Mr. Young's opinion was more reliable than that of the plaintiff's expert would obviously depend, in part, on the extent of his background and experience in Absorption/Inhibition testing. And yet, counsel for the plaintiff did nothing between July 6th, when the Young report was issued, to November 9th when Mr. Young was deposed to obtain information that would have

---

[3] These reports were not attached to the Motion to Compel and were provided at my request.

revealed the extent (or lack thereof) of Mr. Young's experience and proficiency in Absorption/Inhibition testing and in his experience and proficiency (or lack thereof) in evaluating its results.

On November 9th Mr. Young was deposed. At the deposition, he said that he had done 10 to 15 separate tests where he was looking for "antigens that might be in a semen stain." (Tr. 153). There were no follow up questions designed to test the truthfulness of this answer or to explore the circumstances of those 10 to 15 tests, which spanned a 9-year period, and no request was made at the deposition for documents that related to these tests. At the deposition, Mr. Young also said that he, like Mr. Lenz, would have concluded that the test results were "inconclusive." (Plaintiff's Motion to Compel Production of Documents from Defendant's Proffered Expert, Arthur Young, at 2). Plaintiff's counsel did not follow up on this answer and did not at that time request any data or information that would have tended to demonstrate Mr. Young's familiarity or lack thereof with Absorption/Inhibition testing. It was not until January 8th, 2 months later, that plaintiff's counsel asked in a letter to defendant's counsel for the records relating to the 10 to 15 cases in which Mr. Young testified he conducted Absorption/Inhibition testing in the last 9 years. Counsel for the defendant immediately and unequivocally refused to provide the information pointing out that discovery had been closed many months earlier.[4]

On January 11th, Mr. Miller's counsel moved to compel the "bench notes and written reports" for the 10 to 15 cases in which Mr. Young had used Absorption/Inhibition testing. According to the Motion to Compel, the requested documents "will provide evidence of whether Young, in fact, uses the method of interpreting Absorption/Inhibition testing" mentioned at his deposition, and "will also

---

[4] This information was obtained through questioning of counsel at a hearing on January 20, 2010.

provide evidence of Young's proficiency (or lack of proficiency) in conducting Absorption/Inhibition testing...." (Motion to Compel, at 3). There is nothing in the Motion from which it may be inferred that Mr. Young had lied or exaggerated either the fact or the extent of his use of the Absorption/Inhibition test. His statement that he had utilized the technique elicited no further questions at the deposition and 2 months passed without a hint from the plaintiff's lawyer that that information was of interest, let alone that it was significant. It may be noted parenthetically that Mr. Young's overall credibility – not of course his particular opinion in this case – was sufficient to warrant his then current employment by Mr. Neufeld's Innocence Project.[5]

In any event, the defendant has objected to the Motion to Compel on the grounds that it is untimely. And untimely it indeed is.[6] The defendant's brief has cited a number of cases that discuss the importance of deadlines in litigation and the broad discretion that courts have in overseeing discovery generally and in dealing with untimely motions for discovery specifically. One is *Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.*, 2007 WL 167356 (N.D.Ill. 2007). There, the court rejected a Motion to Compel filed months after fact discovery closed. The opinion pointed out that the Seventh Circuit has warned repeatedly of the importance of deadlines and that ignoring deadlines is the surest way to lose a case. *See United States v. Golden Elevator, Inc.*, 27 F.3d 301, 302 (7th Cir.1994). *See also Harris v. Owens-Corning Fiberglass Corp.*, 102 F.3d 1429, 1433 (7th Cir.1996). The opinion explained:

---

[5] This information was also obtained during the colloquy with counsel at the January 20th hearing. Because of this concurrent employment by the Innocence Project and the plaintiff, Mr. Neufeld did not attend the deposition of Mr. Young.

[6] The defendant's response brief raises only the issue of the Motion's untimeliness. It does not raise any issue as to discoverability. Hence, that is an issue that is not before me.

'We live in a world of deadlines .... The practice of law is no exception.' *Raymond v. Ameritech Corp.,* 442 F.3d 600 (7th Cir.2006).

Throughout the range of the law, there are time limits imposed on parties at every stage of the case. Some are mandatory and admit of no deviations; others are more flexible. But in each instance, lawyers who do not pay heed to Shakespeare's injunction-"Defer no time delays have dangerous ends." Henry VI, Part I (1592) Act III, sc. ii 1.33- do so at substantial peril to their clients' interests. Even a day's delay can be fatal. *See, e.g., Brosted v. Unum Life Insurance Co. of America,* 421 F.3d 459 (7th Cir.2005); *Raymond,* 442 F.3d at 600; *Reales v. Consolidated Rail Corp.,* 84 F.3d 993, 996 (7th Cir.1996). Although the Federal Rules of Civil Procedure place no prescribed time limit on the outside date for filing a motion to compel discovery-leaving the question of timeliness to the broad discretion of the district court to control discovery-a line of sorts has been etched by a series of decisions: motions to compel filed after the close of discovery are generally deemed untimely. *See Packman v. Chicago Tribune Co.,* 267 F.3d 628, 647 (7th Cir.2001); *Rossetto v. Pabst Brewing Co.,* 217 F.3d 539, 542 (7th Cir.2000) (two month delay with no excuse offered); *Banks v. CBOCS West, Inc.,* 2004 WL 723767 (N.D.Ill.2004) (Zagel, J.) (lawyer's busy schedule is not a sufficient excuse). *See generally In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 331, 332 (N.D.Ill.2005); 8A Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, Federal Practice and Procedure, § 2285 (2d ed.1994).

"But even here the line meanders, and motions made after the close of discovery are not inevitably out-of-bounds. *[citations omitted]*." *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. at 331 n. 1. Where the motion is accompanied by a reasonable and persuasive justification for its untimeliness, an extended delay may be excused. *See e.g., Blanchard v. EdgeMark Financial Corp.,* 192 F.R.D. 233, 235-36 (N.D.Ill.2000) (a month's delay excused). However, when the movant fails to give a reasonable justification, courts' general aversion to unjustified delays usually result in denials of the motions.

The cases, it must be said, cannot always be harmonized. But the apparent dissonance is inevitable given the discretionary nature of the decisions: discretion denotes the absence of a hard and fast rule. *Langnes v. Green,* 282 U.S. 531, 541 (1931); *Pruitt v. Mote,* 472 F.3d 484 (7th Cir.2006); *Rogers v. Loether,* 467 F.2d 1110, 1111-1112 (7th Cir.1972) (Stevens, J.), *aff'd sub nom, Curtis v. Loether,* 415 U.S. 189 (1974). Being a continuum not a point, discretion allows two decision makers, on virtually identical facts, to arrive at opposite conclusions, both of which constitute appropriate exercises of discretion. *Compare United States v. Boyd,* 55 F.3d 239 (7th Cir.1995) *with United States v. Williams,* 81 F.3d 1434 (7th Cir.1996). It is only when no reasonable person could agree with the district court's conclusion that it can be said that a discretionary choice is abusive. *See Rivera v. City of Chicago,* 469 F.3d 631

8

(7th Cir.2006).

> In the last analysis, where the line is to be drawn between the timely and impermissibly untimely-or, to use Justice Cardozo's observations made in another context-"between the important and the trivial," cannot be settled by a formula. *Jacob & Youngs, Inc. v. Kent,* 230 N.Y. 239, 243, 129 N.E. 889 (1921). *Compare Louisville Gas & Electric v. Coleman,* 277 U.S. 32 (1928) (Holmes, J., dissenting). The answer must necessarily be found in the entire complex of circumstances that gave rise to the motion.

*Fast Food Gourmet, Inc.,* 2007 WL 1673563 at 2 -3. *See also Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust,* 290 F.3d 843, 851 (7th Cir. 2002)("Courts have a legitimate interest in ensuring the parties abide by scheduling orders to ensure prompt and orderly litigation."); *Finwall v. City of Chicago,* 239 F.R.D. 494 (N.D. Ill. 2006).

The only attempted justification for the lateness of the Motion is the apparent claim that the plaintiff could not have anticipated Mr. Young's testimony in his deposition that he would have concurred with Mr. Lenz's conclusion of inconclusiveness. That contention is belied by several factors. First, Mr. Young's July 6th report cannot possibly be read as anything other than a repudiation of the plaintiff's expert's conclusions that Mr. Lenz's finding of inconclusiveness was essentially fraudulent and an affirmation by Mr. Young of the legitimacy of Mr. Lenz's conclusion. *See supra* at 5. Second, the failure of plaintiff's counsel to ask a single follow up question at the deposition when Mr. Lenz said he too would have found the test inconclusive is further evidence that the answer did not come as a surprise in light of Mr. Young's July 6th expert report. *Cf., In re Sulfuric Acid Antitrust Litigation,* 235 F.R.D. 646, 650 (N.D.Ill. 2006).[7] Third, plaintiff's counsel's

---

[7] *Compare Muhammad v. Oliver,* 547 F.3d 874, 877 (7th Cir. 2008) (Posner, J)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening."); Jean Edward Smith, John Marshall: Definer of a Nation (1996)("More than five weeks have elapsed since the Supreme Court declared the necessity of proving the fact, if it exists. Why is (continued...)

failure to make the request for the now-sought documents for 2 months following the deposition further supports the conclusion that the answer at the deposition came as no surprise and was foreshadowed by the Report. *Id.*

In sum, federal trial judges are called upon to manage notoriously crowded dockets. "Necessarily, they must have substantial discretion as they manage their dockets." *Reales v. Consolidated Rail Corp.,* 84 F.3d 993, 996 (7th Cir.1996). In the instant case, discovery proceeded along a prescribed path charted by Judge Conlon, who granted numerous extensions of discovery to the plaintiff. Now, the plaintiff effectively wants a further extension to obtain documents, whose existence is uncertain and which may prove nothing. "Without any evidentiary support, [Mr. Miller's] request amounts to nothing more than a fishing expedition...." *Grayson v. O'Neill,* 308 F.3d 808, 817 (7th Cir. 2002), which, as in *Grayson,* should be denied.

While acknowledging the imminence and inflexibility of the February 22nd trial date, Mr. Miller's counsel has argued that requiring production of the requested materials will not affect that date since he will not seek a continuance, nor will he attempt to depose further Mr. Young or anyone else. That, however, does not eliminate the obvious and significant prejudice to the defendant. The parties have only a month remaining to prepare for trial – a trial of substantial complexity given the scientific nature of the testimony and the passage of 28 years with its inevitable dulling of memories. *See Jarad v. Gonzales,* 461 F.3d 867, 870 (7th Cir. 2006); *Title Guaranty & Trans. Co. v. Pam,* 232 N.Y. 441, 445 (1922)(Cardozo, C.J.); *Dickey v. Florida,* 398 U.S. 30, 42 (1970)(Brennan, J., concurring).

---

[7](...continued)
it not proved? Chief Justice Marshall said he could not assume that the government was remiss in seeking the proof; the only conclusion was that the evidence did not exist.").

If the Motion to Compel were granted, counsel for the defendant and Mr. Young would have to familiarize themselves with 10 to 15 separate scientific analyses conducted over a 9-year period. Instead of being able to prepare to deal with the evidence that they could reasonably anticipate would be adduced in support of the plaintiff's case and which they could reasonably anticipate would be used to examine Mr. Young, their attention would now be diverted to the 10-15 other matters which have thus far played no role in the case. That is a substantial undertaking in and of itself. But it is one that may have no tangible benefits since the plaintiff's counsel may decide not to utilize the information they have received. Moreover, defense counsel would not know which of the several analyses would be used by the plaintiff, and it could not depose the plaintiff's expert to learn what opinions he might have and/or offer based on the produced information. This result cannot be squared with the desideratum of the discovery provisions of the Federal Rules of Civil Procedure.

There was a time when "[t]o require the disclosure to an adversary of the evidence that is to be produced would be repugnant to all sporstmanlike instincts." 6 Wigmore, Discovery § 1845 at 490 (3rd Ed.1940). Indeed, the common law's sporting theory of justice permitted the litigant to reserve evidential resources (documents and witnesses) until the final moment, marshaling them at the trial before his surprised and dismayed antagonist. It did not openly defend or condone trickery and deception; but it did regard "the concealment of one's evidential resources and the preservation of the opponent's defenseless ignorance as a fair and irreproachable accompaniment of the game of litigation." *Id. See also* 8 Wright, Miller & Marcus, Federal Practice & Procedure: Civil 2d § 2001 at 40 (1994).

Today's attitude toward discovery is vastly different. Contrary to the common law's approach, contemporary thought has concluded that secrecy is not congenial to truth-seeking, and that trial by

11

ambush is incompatible with the just determination of cases on their merits. *See Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512 (2002); *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 253 (1978) (Powell, J., concurring and dissenting); *Hickman v. Taylor,* 329 U.S. 495, 500 (1947); Rule 1, Federal Rules of Civil Procedure. By requiring comprehensive *and timely* disclosure of relevant information, the Federal Rules of Civil Procedure seek to avoid the surprise and secrecy that are antithetical to the informed determination of cases of their merits. *Cf., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512-13 (2002). *See also American Floral Services, Inc. v. Florists Transworld Delivery Ass'n,* 107 F.R.D. 258, 260 (N.D.Ill.1985) (Shadur, J.).

The inevitable result of granting the Motion to Compel would be to put the defendants at a significant and irreparable disadvantage. It could result in the very trial by ambush the Federal Rules of Civil Procedure forbid.

For all these reasons, the Motion to Compel is denied.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 1/20/10